**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | **CASE NO. 1:23-CR-91 (RGA)** |
| **ROBERT DORSEY,** | : | |
| | : | |
| **Defendant.** | : | |

**THE UNITED STATES' SENTENCING MEMORANDUM AND
MOTION FOR AN UPWARD DEPARTURE**

*"I don't like giving out bullets, cause then I feel like I did it to the person."*

The Defendant, a self-proclaimed leader of the Thunderguards, was no stranger to gun trafficking, stating "I've been doing this shit [a] long time" to a Confidential Informant ("CI") while facilitating a gun deal. His criminal history shows he is not a stranger to drug dealing either. Despite his extensive criminal history, he continued to deal drugs and sold firearms he knew would be used for violence. He did so willingly and with a blatant disregard for the law, and the full extent of his conduct along with his criminal history are precisely why an upward departure is reasonable and appropriate.

The government hereby moves for a two offense-level upward departure to a total offense level 25, pursuant to Section 5K2.21 of the United States Sentencing Guidelines ("U.S.S.G."), to reflect the full scope of the defendant's conduct. The government also moves for an upward departure to criminal history category IV, pursuant to Section 4A1.3 of the U.S.S.G., to reflect the extent of the defendant's criminal history. These departures generate a guideline range of 84-105 months, and

1

for the reasons stated below, the government seeks a sentence of 90 months in prison.

## PROCEDURAL POSTURE

On November 7, 2023, a Grand Jury sitting in the District of Delaware indicted the defendant with two counts of firearms trafficking, two counts of possession of a firearm by a prohibited person, and distribution of controlled substances. Amended Presentence Investigation Report ("PSR") ¶ 1. On August 4, 2024, the Honorable Richard G. Andrews conducted a change of plea hearing, in which the Defendant entered guilty pleas to Counts One and Two of the Indictment, Firearms Trafficking, in violation of 21 U.S.C. § 933. This memorandum now follows.

## STATEMENT OF FACTS

### a. The New Jersey Investigation

The Bureau of Alcohol, Tobacco, Firearm, and Explosives ("ATF") conducted three drug purchases utilizing a CI in early to mid-August 2023, and then a fourth buy which also included a firearm in early September 2023. During the first three drug buys an ATF Undercover Officer (UC) was also present. PSR ¶ 14.

On August 3, 2023, the CI and UC met with the defendant at a residence near the defendant's home in New Jersey. The CI paid $50 for heroin while the UC paid the defendant $950 for crack cocaine. The defendant also gave over the spoon and cup he used to make the crack cocaine. In total 14.18 grams of crack cocaine and 5 baggies of heroin (branded "cash money") weighing 1.26 grams were recovered. PSR ¶ 15.



Fig. 1 – Cash Money heroin



Fig. 2 – Crack cocaine and glass/spoon Dorsey used to make the crack

Then, on August 8, 2023, identical to the first transaction, the CI and UC met the defendant near his home to purchase heroin and crack cocaine. During the transaction, Dorsey stated, "we got chapters everywhere, I'm in a club." When the UC followed up about the Thunderguards, the defendant stated, "I'm a one-percenter (active member)…the Pagans is my boys." PSR ¶ 16-17. In totality, 7.79 grams of crack cocaine and 6 baggies of heroin (branded "Super Mario") weighing 1.89 grams were recovered. *Id.*

3



Fig. 3 – crack and heroin from August 8

Next, on August 17, 2023, the UC and CI set up another buy from the defendant. For this meet, the ATF utilized aerial and ground surveillance. PSR ¶ 18. The defendant sold the UC 39.58 grams of crack-cocaine but then realized he left the heroin at his house. *Id.* Once all three arrived back at the defendant's residence, he went inside and then met the CI at a gas station on the corner where he sold the

4

CI 2.54 grams of heroin, again stamped "Super Mario." *Id.*



Fig. 4 – crack cocaine from August 17 sale



Fig. 5 – heroin from August 17 sale

In the final New Jersey buy, on September 5, 2023, the CI and defendant met at the Hampton Inn in Pennsville, New Jersey. PSR ¶ 21. Law enforcement followed the defendant from his residence and surveilled him picking up the CI at the hotel. *Id.* They drove around before parking, which is when the defendant told the CI that

he had a room at the hotel to spend time with his daughter at the pool. *Id.* The CI and defendant ended up in the communal laundry room, where the gun transaction occurred. *Id.* The CI had told the defendant he wanted the firearm to murder another drug dealer. *Id.* The audio of the transaction, attached as Government's Sentencing Exhibit 1, captures the following:

> [gun racking/removing ammunition from magazine]
> CI: "Hold on, you gonna let me get some of them right?"
> Dorsey: "I don't like giving bullets man"
> CI: "Come on, let me get 2…3 of 'em bro"
> Dorsey: "Ah, cause then I feel like I did it to the person."
> CI: "Nah, bro, you ain't doing shit to nobody."

Government's Sentencing Exhibit 1, at 4:39.

Ultimately the defendant removed all but two rounds for the magazine when he gave it to the CI. PSR ¶ 22. The CI then discussed a second firearm, the one on the defendant's person at the time. *Id.* The above referenced audio captures the defendant stating, "I got my jawn, but I don't want to give it away." Gov Ex. 1.[1] After the gun transaction, the CI fronted the defendant $400 to order methamphetamine, which the defendant said would be ready later. PSR ¶ 23. Later that day, the defendant sold the CI 8.72 grams of crack cocaine. During the buy, which happened at the defendant's vehicle, the CI saw a pistol in Dorsey's vehicle. PSR ¶ 24.

---

[1] *See also* Gov. Ex. 1 at 7:40-8:10 (CI stating, "shoulda give me yours instead.").



Fig. 6 – crack from September 5 purchase



Fig. 7 – NJ Firearm from September 5

### b. *The Delaware Investigation*

On September 20, 2023, around 12:30 pm, the defendant called the CI to finalize a meeting location for a gun transaction. PSR ¶ 25. The defendant was then observed leaving his home in New Jersey with a brown paper bag and a backpack. *Id.* He then drove to a Wal-Mart parking lot in Delaware and called the CI around 1:30 pm. The defendant and CI then met outside the entrance to the Wal-Mart and went inside. PSR ¶ 26. While inside, the defendant sold the CI approximately 8.61 grams of crack cocaine that was unwrapped for $1,000. *Id.*



Fig. 8 – Walmart Crack

The two then exited the store and entered the defendant's vehicle. *Id.* They drove across the street to Steve's Tavern, where the defendant then sold the CI one privately made firearm (PMF) Polymer 80 Inc. 9mm with no serial number. *Id.*

8



Fig. 9 – Walmart/Steve's PMF

The next firearm sale in Delaware occurred on October 3, 2023.  PSR ¶ 27.  The CI, along with an ATF UC who played the role of the ultimate purchaser of the firearms, ultimately agreed to meet the defendant at a Dollar General parking lot in Wilmington, Delaware.  *Id.*  However, prior to the transaction, the ATF UC and CI were at the Wal-Mart where the September 20, 2023 transaction took pace. *Id.* The defendant ultimately insisted on moving the meet to the Dollar General.  *Id.*

While trying to finalize the meeting location and transaction, the defendant stated to the CI, "two jawns right?...I got a trey pound (.357) and something else over there."  PSR ¶ 28.  In a subsequent call, where the CI was trying to get the defendant to come to the Wal-Mart and not move the buy to Dollar General, the defendant stated, "I ain't catering to him (the UC acting as the final purchaser), I don't know what kind of game he thinks this is…I've been doing this shit long time."  *Id.*  The CI tried to calm down the defendant, who was agitated, and stated they would come to Dollar General.  *Id.*   The defendant responded, "I don't need to chill out, I'm an

9

Outlaw B…either come here or don't." *Id.*

The UC and CI moved to the Dollar General strip mall and met with the defendant. PSR ¶ 29. While there, the UC remained in the vehicle while the CI and defendant went into a laundromat within the strip mall. The defendant told the CI that other guys would "be bringing both of them [firearms]." *Id.* Within the laundromat, the defendant told a patron that he was the Vice President of the Thunderguards and also that he wanted the CI and UC to go to the "North Pole," referencing the Thunderguards Clubhouse in Wilmington. PSR ¶ 30.

Approximately thirty minutes later, two males arrived on motorcycles to deliver the firearms. PSR ¶ 31. The CI and the defendant went inside a liquor store where the CI gave the defendant $2,600 for the two firearms. *Id.* The defendant told the CI he would have to wait for the drugs because a third individual was bringing them. *Id.* Once they exited the liquor store, one of the defendant's associates, who called the defendant "Runna," asked if the UC and CI were good and had the paper (money). PSR ¶ 32. The defendant answered that they were good, and the associate gave the CI a blue Nike sling bag with a .40 caliber Smith & Wesson M&P 40 M2.0 (S/N NKF8770), one fifteen-round magazine with eleven rounds of ammunition, and one Smith & Wesson 13 .357 magnum caliber revolver (S/N 2D84641) loaded with five rounds of ammunition. *Id.* The revolver was reported stolen out of Cecil County, Maryland, on September 2, 2023. *Id.*



Fig. 10 – S&W .40 caliber



Fig. 11 – S&W .40 caliber ammo/magazine and .357 ammo



Fig. 12 – Stolen .357 Revolver

On November 9, 2023, ATF executed a search warrant at the defendant's residence, located at 12 Chester Avenue, Deepwater, New Jersey, where the defendant was arrested. PSR ¶ 33. When arrested, the defendant was wearing a Thunderguards shirt. *Id.* In a search of the defendant's vehicle the following was recovered: 1) marijuana; 2) a .22 caliber Iver Johnson pistol (S/N 678) loaded with 6 rounds of ammunition; 3) a pill bottle containing 45 pills that tested positive for amphetamines (24.21 grams); 4) Thunderguards paraphernalia including a leather jacket. *Id.* Of note, the firearm and pill bottle were recovered within the Thunderguards jacket. *Id.*



Fig. 12 – .22 caliber Iver Johnson Pistol



Fig. 13 – Thunderguard Jacket

## THE UNITED STATES' SENTENCING RECOMMENDATION

## INTRODUCTION

As a preliminary matter, the government agrees with Probation's calculation of the guidelines. Based upon a total offense level of 23 and a criminal history category of III, the correct guideline range is 57 months to 71 months of imprisonment. PSR ¶ 174. As mentioned above and detailed below, the government seeks upward departures from both the offense level and criminal history category.

## DEFENSE OBJECTIONS TO THE PSR

As the Court is aware, defense filed objections to the PSR. PSR at pp. 34-42. As outlined in the government's response to the defense PSR objections, the government will have at least one ATF agent at sentencing to testify to contested issues and to support the government's upward departure request. *See* PSR at p. 34. The government groups the defendant's objections into three buckets: 1) offense conduct, 2) the applicable guidelines to be used, and 3) the defendant's criminal history category. PSR at pp. 34-42. As noted above, because the government will produce a witness at sentencing to address the offense conduct, the two outstanding issues for the Court are 1) the applicable edition of the sentencing guidelines in light of ex post facto principles, and 2) the defendant's criminal history category.

Below, the government first addresses the ex post facto analysis. Next, the government addresses the defendant's objection to his criminal history category and the government's motion for an upward departure to criminal history category IV to adequately reflect his criminal history. Then, the government addresses its motion

14

for a two offense-level upward departure to reflect the full scope of the defendant's conduct. Finally, the government addresses the appropriateness of the 90-month sentence it recommends under the 18 U.S.C. § 3553(a) factors.

## THE APPLICABLE GUIDELINE RANGE

Generally, sentencing courts must apply the guidelines in effect at the time of sentencing. *See United States v. Menon,* 24 F.3d 550, 566 (3d Cir.1994). However, where the application of the guidelines in effect at sentencing would result in a more severe penalty than application of those in effect at the time of the offense, the court, to avoid an ex post facto violation, must apply the guidelines in effect at the time of the offense. *See, Peugh v. United States*, 569 U.S. 530, 544 (2013) ("[t]he federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing. A retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an ex post facto violation."); *See also*, *United States v. Omoruyi,* 260 F.3d 291, 297-98 (3d Cir. 2001) (citing *United States v. Brannan,* 74 F.3d 448, 450 n. 2 (3d Cir.1996); *United States v. Cherry,* 10 F.3d 1003, 1014 (3d Cir.1993)).

Should the Court find that ex post facto principles require the use of an earlier set of guidelines, those guidelines should be used in their entirety in generating the correct guideline range. "The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." U.S.S.G § 1B1.11(b)(2).

Here, under the 2021, 2023, or 2024 guidelines, the ultimate total offense level

remains the same.  PSR at pp. 38-39.  The government did an itemized ex post facto analysis in its response to the defendant's objections to the PSR.  PSR at pp. 36-38. As stated therein, one guidelines provision, U.S.S.G. § 2K2.1(b)(4), does expose the defendant to a four offense-level enhancement under the 2023 and 2024 Guidelines where he would have faced only a two offense-level increase under the 2021 Guidelines.  *Id.* at 37.  However, that impact is neutralized by U.S.S.G. § 2K2.1(b)(5), which exposes the defendant to a two offense-level enhancement under the 2023 and 2024 Guidelines where he would have faced a four offense-level increase under the 2021 Guidelines. *Id.* at 37-38.  As discussed in the government's responses to the defendant's objections to the PSR, and as shown below, the defendant faces the same total offense level under the 2021, 2023, or 2024 Guidelines.  *Id.* at 36-38.

The government agrees with the Probation Office that, where the later guidelines do not expose the defendant to a higher total offense level, they do not implicate ex post facto principles, and the guidelines in effect at sentencing should apply.  PSR at 38-39; U.S.S.G § 1B1.11(b)(2) (stating one set of guidelines should be applied in its entirety).  As the Supreme Court has stated, the ex post facto analysis is animated by "basic principles of fairness" and guards against a "retrospective increase in the Guidelines *range.*"  *Peugh*, 569 U.S. at 544 (emphasis added).

Below are the guidelines as applied under the 2021 edition (in effect at the time of the offense) and the 2024 edition (in effect at sentencing):

16

| *18 U.S.C. §§ 933(a)(1), 922(g)(1)[2] (2021 Calculations)* | | |
|---|---|---|
| Base Offense Level | 14 | §2K2.1(a)(6)(A) |
| Number of Firearms (4 total) | +2 | §2K2.1(b)(1)(A) |
| Stolen Firearm | +2 | §2K2.1(b)(4)(A) |
| Trafficking | +4 | §2K2.1(b)(5) |
| Possessed Firearm w/ other Felony | +4 | §2K2.1(b)(6)(B) |
| | | |
| *Total* | 26 | |

| *18 U.S.C. §§ 933(a)(1), 922(g)(1) (2024 Calculations)* | | |
|---|---|---|
| Base Offense Level | 14 | §2K2.1(a)(6)(A) |
| 4 Firearms (1 New Jersey/3 Delaware) | +2 | §2K2.1(b)(1)(A) |
| Unmarked Firearm | +4 | §2K2.1(b)(4)(B)(ii) |
| Transferred Firearm Knowing of Unlawful Purpose | +2 | §2K2.1(b)(5)(B)(i)(II) |
| Possessed Firearm w/ other Felony | +4 | §2K2.1(b)(6)(B) |
| | | |
| *Total* | 26 | |

In the conclusion of *Peugh*, the Court highlights that the intent behind ex post facto is to forbid the government from enhancing punishment by altering how the guidelines are calculated at sentencing to avoid creating a "significant risk" of a higher sentence for the defendant. *Peugh*, 569 U.S. at 550. That is not the case here given the guidelines lead to the same result, utilizing ultimately the same factors. It is the government's position that because there is no substantive difference in how the guideline range is calculated, there is no ex post facto violation, and the Court can utilize the guidelines in effect at the time of sentencing.[3] Should the Court

---

[2] In the May 1, 2023, U.S.S.G. amendments, the Commission noted that 18 U.S.C. § 933 offenses would be guided by § 2K2.1.

[3] The government's witness will also testify to ensure the government meets the

17

disagree and utilize the 2021 Guidelines, the guideline range will remain the same, as will the government's request for an upward departure as addressed below.

### THE DEFENDANT'S CRIMINAL HISTORY AND GOVERNMENT'S UPWARD DEPARTURE TO CRIMINAL HISTORY CATEGORY IV

Defendant objected to the application of two criminal history points for a 2015 resisting arrest conviction where the defendant served 107 days in custody. PSR ¶ 112, pp. 41-42. The government refers the Court to the PSR objection response on pages 40-41. Simply put, the defendant's sentence was imposed within ten years of the instant conduct and is appropriately counted. *See*, U.S.S.G. § 4A1.2(e)(2).

The government anticipates the defense will ask for a downward departure or variance, arguing those two criminal history points should not count, and therefore the defendant is really a criminal history category II and his guideline range should be 51-63 months. The government would object to such a request.

Whether the Court finds the two points are correctly or incorrectly assessed to the defendant, the government moves for an upward departure to criminal history category IV pursuant to U.S.S.G. § 4A1.3 because the defendant's criminal history substantially under-represents the seriousness of his criminal history and likelihood that he will continue to commit crimes. *See*, U.S.S.G. § 4A1.3(a)(1).

The Third Circuit has held that § 4A1.3 was designed to "provide flexibility in those cases where a point-by-point calculation of the defendant's criminal history category is not alone sufficient to reflect his culpability and dangerousness." *United*

---

preponderance standard for any contested offense characteristic under either 2021 of 2024 Guidelines.

*States v. Perry*, 460 Fed. Appx. 149, 154 (3d Cir. 2012), citing *United States v. Harris,* 44 F.3d 1206, 1214 (3d Cir. 1995). For example, in *Perry*, the Court considered adult convictions of similar conduct that received zero criminal history points and juvenile adjudications as part of the basis for an upward departure.[4]  *Id.*  In fact, Perry's guidelines were also calculated as 57 to 71 months and the District Court concluded that criminal history category IV was appropriate and utilized guidelines of 77 to 96 months, ultimately sentencing Perry to 90 months.

Here, defendant's criminal engrossment began in 1994, at the age of 16, when he was adjudicated delinquent for possession with intent to deliver a controlled substance in New Castle County.  PSR ¶ 52.  Two years later, now 19, defendant pled guilty in New Castle County Superior Court to possession with intent to deliver a Schedule II controlled substance where he was sentenced to three years imprisonment, suspended after one year for two years of probation.  PSR ¶ 68.

Then in 2000, now 22, the defendant pled guilty to possession with intent to deliver within 1000 feet of a school – cocaine, again in New Castle County.  PSR ¶ 78. In that case, he was sentenced to four years imprisonment, suspended after serving one year for three years of home confinement.  *Id.*  That same year, the defendant pled guilty in two separate Robbery Second Degree cases, again in New Castle County.  PSR ¶¶ 80, 82.  All three of these 2000 cases were disposed of by way of

---

[4] *See*, § 4A1.2, n.8: "If the Court finds that a sentence imposed outside this time period of evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3."

19

global plea – but were three separate offenses, tied to drugs and violence, in the same year.  PSR ¶¶ 78-82.

Just three years later, now 26, defendant pled guilty to maintaining a vehicle for keeping a controlled substance (felony) in New Castle County.  PSR ¶ 88.  He was sentenced to three years of imprisonment, suspended after two years for nine months of work release or home confinement.  *Id.*  Worth mentioning, the defendant, like in the instant offense conduct, was in possession of crack cocaine.  PSR  ¶ 90.

At age 29, in 2006, the defendant, with 4 felony drug convictions or adjudications and 2 robbery convictions under his belt, pled guilty to yet another drug felony.  Again, he was convicted of maintaining a vehicle for keeping controlled substances and was sentenced to six months imprisonment.  PSR ¶ 99.  Of no surprise, it was yet again crack cocaine that the defendant possessed.  *Id.*

In 2009, the defendant was involved in a chase with Delaware State Police where he crashed into a marked police vehicle and a parked Honda Civic.  PSR ¶ 105. The defendant admitted to being involved in the crash.  PSR ¶ 109.  He was convicted of Assault Second Degree (felony) and sentenced to six years of imprisonment with 208 days of time served, suspended after 30 months for 18 months work release. PSR ¶ 103.[5]

Defendant's final conviction is from 2011, where he was convicted of resisting arrest in New Jersey based on outstanding warrants from the State of Delaware and

---

[5] The government notes similar cases involving resisting arrest, flight, or impersonation to avoid law enforcement at PSR ¶¶ 62, 75, 94.

Cumberland County, New Jersey.  PSR ¶¶ 112-113.  The defendant fled from law enforcement and jumped from his vehicle, causing it to roll into a police car.  PSR ¶ 114.  The defendant was held in Delaware on the above-referenced warrants before finally being released and resolving the matter in 2014 – pleading to time served of 107 days.  PSR ¶ 112.  The Court even noted aggravating factors in defendant's sentencing, including his lengthy criminal record, serious crimes, and need for deterrence.  PSR ¶ 116.

The defendant's criminal record is extensive.  It is a revolving door of drug convictions, violent crimes, and conduct involving danger to law enforcement and the community at large.  It began at the age of 16 and has not stopped.  He simply cannot stop selling drugs or being involved in violent and dangerous behavior.   Defendant's record does not adequately reflect his criminal history and concerns for recidivism. *See United States v. Barnes*, 430 F. Supp. 3d 9, 14 (W.D. Pa 2019) ("Defendant's criminal history and propensity to engage in dangerous, violent criminal conduct is not commensurate with those individuals who have between four and six points and fall in category III . . . his likelihood to recidivate more closely resembles offenders who fall within category IV").

To underscore how extensive and dangerous the defendant really is, he would have been an Armed Career Criminal (ACCA) under U.S.S.G. § 4B1.4 and qualified a mandatory 15-year sentence had he pled to 18 U.S.C. § 922(g), pursuant to 18 U.S.C. § 924(e)(2).  Defendant has two separate Robbery Second Degree convictions.  *See*, PSR ¶¶ 80, 82; *see also United States v. Stanford*, 75 F.4th 309 (3d Cir. 2023) (11 Del.

Code § 832, and second-degree robbery, § 831, are categorically crimes of violence under the 4B1.2 elements clause; these provisions are divisible, but in any event, every type of robbery under these statutes qualifies, as the crimes require proof of the intentional use or threat of force).  Defendant also has multiple qualifying "serious drug offense[s]" including possession with intent to deliver a narcotic Schedule II (1997) and possession with intent to deliver within 1000 feet of a school – cocaine (2000).  *See*, PSR ¶¶ 68, 78; *see also United States v. Daniels*, 915 F.2d 148 (3d Cir. 2019) (finding a prior state conviction for possession with intent to deliver as a "serious drug offense" under Armed Career Criminal Act (ACCA)).[6]

A defendant who could have faced a 15-year statutorily mandated penalty *because* of a career made from repeatedly committing drug and violent crimes offenses is *not* a defendant who should be treated like a typical criminal history category III defendant.  *See, United States v. Broomer*, 71 Fed.Appx. 165 (3d Cir. 2003) (affirming upward departure to sentence a defendant as if he were a career offender, because defendant had not been sentenced on his otherwise qualifying predicate conviction).  A criminal history category of III for this defendant is improper.  Looking at the totality of his criminal history, he is more appropriately viewed as a criminal history category IV and the Court should upward depart and treat him as such.

**THE GOVERNMENT'S UPWARD DEPARTURE UNDER U.S.S.G. § 5K2.21**

The government submits a two-level upward departure to a total offense level

---

[6] The government has attached as sentencing exhibits all relevant police paperwork and court documents in its possession related to the defendant's status as ACCA as well as relevant to his understated criminal history.

25 based on dismissed and uncharged conduct. U.S.S.G. § 5K2.21. The Court may depart upward to reflect the actual seriousness of the offense based on conduct that is 1) underlying a charge dismissed as part of a plea agreement, or underlying potential charge not pursued in the case as part of a plea agreement or for any other reason; and 2) that did not enter into the determination of the applicable guideline range. *Id.*, *see also United States v. Barnes*, 84 Fed. App'x 201 (3d Cir. 2003) (affirming upward departure based on understated criminal history, U.S.S.G. § 4A1.3, and uncharged conduct, U.S.S.G. § 5K2.21, for uncharged crimes that were not taken into consideration).[7]

The government will not repeat the full recitation of facts outlined in the first portion of this Sentencing Memorandum, but herein focuses on the conduct that gives rise to the departure. First, the guidelines do not contemplate the scale or nature of the defendant's drug dealing. He conducted drug sales four times in New Jersey – consistently crack cocaine. Then, he ratcheted up his behavior by possessing and selling guns along with drugs in both New Jersey and Delaware. Defendant's ongoing drug dealing throughout the investigation, intertwined with his criminal history for the same conduct discussed above, factors in favor of an upward departure.

However, the strongest reason to depart upward is the uncharged possession of a firearm in furtherance of a drug trafficking crime that the defendant committed on at least one occasion. The defendant possessed a firearm during a drug deal with

---

[7] The government has discussed the defendant's 18 U.S.C. § 922(g) exposure above. The defendant's firearm possession is also a reason to depart under U.S.S.G. § 5K2.21.

the CI at the motel in New Jersey.  The concept of a defendant possessing a firearm during a drug deal is not foreign – as discussed in *United States v. Ceballos-Torres,* 218 F.3d 409, 412 (5th Cir. 2000), "an accessible gun provides defense against anyone who may attempt to rob the trafficker of his drugs or drug profits" and "having a gun accessible during a transaction provides protection in case a drug deal goes sour."

Additionally, courts have held that selling guns and drugs in the same transaction, as occurred here, constitutes "use" of a firearm in the context of 924(c). *See United States v. Latham*, 578 Fed. App'x 312 (4th Cir. 2014) (citing *United States v. Claude X*, 648 F.3d 599, 603-04 (8th Cir. 2011)); *see also, United States v. Daniels,* 173 Fed. App'x 766 (11th Cir. 2006) (evidence that defendants were selling guns and drugs together supported conviction for use of a firearm during and in relation to a drug trafficking crime because of the dangerous combination of guns and drugs throughout the preparation, negotiation, and transaction of the deal).

*Latham*, where the defendant discussed the sale of a firearm during a drug sale to a CI, additionally stated that when a drug buyer "sweetens the pot by offering to purchase not only drugs, but a gun as well, the firearm facilitates the drug transaction, making it possible for the drug buyer to get the drug seller to take the risks inherent in selling contraband."  578 Fed. App'x at 315 (cleaned up) (citing *United States v. Lipford*, 203 F.3d 259, 267 (4th Cir. 2000)). Here, the CI made three drug purchases before upping the ante to buying firearms – which facilitated the underlying drug deal like *Latham*.

24

Finally, 18 U.S.C. § 924(c) discusses firearm possession "in relation to" drug trafficking. Again, the caselaw on that phrase aligns with the defendant's conduct. In *Smith v. United States*, 508 U.S. 223, 223-34 (1993), the Court stated that the phrase "in relation to" meant the firearm must have some "purpose or effect with respect to the drug crime" and its presence or involvement cannot be the result of "accident or coincidence." The gun must have the potential of facilitating the drug trafficking offense. Here, during the New Jersey deal, the defendant had a firearm on his person, and in fact the CI referenced wanting the defendant's firearm instead during a conversation with the defendant while the CI was fronting the defendant drug money. Later that day, when the CI picked up the previously purchased drugs, the CI again observed the defendant with a firearm in his car.

This Court is well aware of the dangers of guns and drugs together. It is a recipe for violence and corrodes communities. Any appropriate sentence for the defendant must address this uncharged conduct. As noted above, the government submits that a two offense-level increase is appropriate.

The government has requested a two offense-level upward departure to offense level 25, to reflect the full scope of the defendant's conduct; and an upward departure to criminal history category IV, to reflect the seriousness of his criminal history. In the aggregate, those departures would yield a guidelines range of 84-105 months.[8]

---

[8] For comparison, had defendant been convicted of 18 U.S.C. 924(c) and qualified as an Armed Career Criminal, his guidelines would have been 360-life at trial and 262-327 with a plea.

25

## THE § 3553(A) FACTORS SUPPORT THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Court must consider several statutory factors when sentencing any defendant. *See* 18 U.S.C. § 3553(a). Each of these factors supports a sentence of 90 months' incarceration. Both the nature and circumstances of the offense as well as the history of the defendant have been discussed at length above and favor a lengthy sentence.

The Court must also consider how the sentence imposed reflects the seriousness of the offense, will promote respect for the law, and will provide just punishment. The seriousness of defendant's crimes can't be understated. He sold crack cocaine and firearms on numerous occasions and possessed his own firearm during at least some of those transactions. Further, he did so while also flaunting his role within an Outlaw Motorcycle Gang – the Thunderguards. Not only does this conduct reflect the seriousness of the crimes, but it also illustrates the defendant's brazenness and lack of respect for the law. Defendant has extensive experience within the criminal justice system and has never reformed. Instead, he continues to reoffend, and now has added firearms trafficking to his traditional crime of choice – dealing crack cocaine. A sentence of 90 months accurately reflects the seriousness of defendant's crimes and promotes respect for the rule of a law – something the defendant's criminal history shows he is lacking.

Additionally, the sentence must address deterrence for the defendant and other criminals. Again, a sentence of 90 months adequately addresses these factors. Defendant himself must be deterred. He has engaged in criminal activity for his

26

entire life, and now has escalated to gun trafficking as well as drug trafficking. A lengthy sentence is needed to deter the defendant from continuing, and continuing to ratchet up, such conduct upon his release. Additionally, a lengthy sentence is more likely to deter other criminal actors from trafficking in firearms with drugs, one of the most dangerous combinations in our society.[9]

Finally, the public must be protected. Defendant pushes drugs, stolen firearms, and PMFs into communities. He does so while carrying a firearm himself, touting his role in a gang, and demonstrating no remorse for his actions. Moreover, he engaged in these dangerous activities on numerous occasions in public locations such as strip malls and tavern parking lots in broad daylight, posing a serious danger not just to the people involved in the transactions but to the surrounding community. The defendant attempted to absolve himself of the danger he posed to the community by telling the CI that "I don't like giving out bullets cause then I feel like I did it to the person." But he then immediately undermined that statement by giving a *loaded firearm* to the CI. The defendant's acknowledgment that distributing guns and bullets facilitates homicides, followed immediately by exactly that behavior, speaks volumes to who the defendant is. He is a true danger to the citizens of New Jersey and Delaware. A sentence of 90 months is appropriate to protect the citizens of the

---

[9] It is clear the defendant was not acting alone. This is not only illustrated by two associates, on motorcycles, delivering guns to the Delaware gun buy but also during the New Jersey gun buy at the motel when the defendant states "he brings it from Delaware" referring to the gun he sold the CI. *See*, Gov. Ex. 1 at 6:15. Other criminals, including defendant's associates, follow the outcome of criminal cases and a lengthy sentence sends a message that such conduct is unacceptable.

27

region from the gun violence associated with gun trafficking and the continued increase in drugs on the street.

## CONCLUSION

For the reasons outlined above, the United States respectfully requests the Court grant upward departures to offense level 25 and criminal history category IV, and impose a sentence of 90 months incarceration followed by 3 years' supervised release.

Respectfully submitted,
DAVID C. WEISS
United States Attorney


By:  *Samuel S. Frey*
Samuel S. Frey
Assistant United States Attorney


Dated:  January 16, 2025

28