IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,   :
                           :
      Plaintiff,      :
                           :
   v.          :     Criminal Action No. 23-91-RGA
                           :
ROBERT DORSEY,     :
                           :
      Defendant.    :

**DEFENSE'S OBJECTIONS TO
THE CALCULATED SENTENCING RANGE**

I.    **INTRODUCTION**

Robert Dorsey, through undersigned counsel, hereby submits this written objection to the calculated sentencing range. The sentencing range calculated by the Office of United States Probation and Pretrial Services for the District of Delaware (Probation) of 57 months to 71 months based on a Total Offense Level of 23 and a Criminal history Category of III is incorrect. Presentence Report (PSR) at ¶ 174. For the reasons set forth below, the actual sentencing range is 18 months to 24 months per the 2021 United States Sentencing Guidelines (U.S.S.G). This is based on a Criminal History Category of III and a corrected Total Offense Level of 16. Mr. Dorsey seeks a sentence within the corrected Guidelines range.

## II.    SENTENCING GUIDELINES CALCULATION

### A. Probation's Calculation [1]

Probation calculated Mr. Dorsey's advisory sentencing range as 57 months to 71 months based on a Total Offense Level of 23 and a Criminal History Category of III. PSR at ¶ 174. This calculation is based on a starting offense level of 14, pursuant to U.S.S.G. §2K2.1(a)(6)(A), *Id*. at ¶ 40. Probation then applied a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(A) based on the belief that Mr. Dorsey's offense involved 3 or more firearms. PSR at ¶ 41. Next, Probation applied a four-level increase pursuant to U.S.S.G. §2K2.1(b)(4)(B)(ii), based upon the belief the offense involved a firearm not otherwise marked with a serial number. Probation also included a two-level increase pursuant to U.S.S.G. §2K2.1(b)(5)(B)(i)(II), based on the belief Mr. Dorsey knowingly or with reason to believe sold a firearm to someone who intended to use it unlawfully. Lastly, Probation applied a four-level increase, pursuant to U.S.S.G. §2K2.1(b)(6)(B), believing the defendant possessed a firearm in connection with another felony offense.

---

[1] The government bears the burden to prove the applicability of the sentencing enhancements included in the PSR and objected to by the Defense. The Defense intends to hold the government to its burden.

Probation's calculation is incorrect. For the reasons stated below, the correct sentencing range for Mr. Dorsey is 18 to 24 months based on a total offense level of 13 and a Criminal History Category of III.

The Defense will be addressing Mr. Dorsey's sentencing calculation through the lens of the November 1, 2021, Guidelines Manual. This is the sentencing manual that was in effect at the time of Mr. Dorsey's offense. Use of the 2021 manual is required if it results in a less severe sentence than would result with the use of the 2024, Guidelines Manual that is in effect now. *See Peugh v. United States*, 569 U.S. 530, 133 S. Ct. 2072, 186 L. Ed. 2d 84 (2013). The government does not contest this fact. PSR Objections addressing ¶¶ 42 and 43 at 36. Mr. Dorsey does recognize that the 2024 Guidelines Manual would apply if, the Court ultimately concludes that the final sentence is not greater using the current Guidelines Manual than it would be had the 2021 manual been used.

### B. <u>There were no Stolen Firearms</u>

Pursuant to U.S.S.G. § 2K2.1(b)(4)(B)(ii), Probation applied a four-level increase under the premise that the defendant knew that any firearm involved in the offense was not otherwise marked with a serial number (other than a firearm manufactured prior to the effective date of the Gun Control Act of 1968) or was willfully blind to or consciously avoided knowledge of such fact. PSR at ¶ 42. However, this

enhancement was not added to the Guidelines Manual until the issuance of the 2023 version. Furthermore, Probation utilized the 2024 manual to determine Mr. Dorsey's offense level. PSR at ¶ 38. Because this enhancement is not found in the 2021 manual and (as explained above) that is the version that applies to Mr. Dorsey, this enhancement cannot be used to determine his offense level.

The government argues in the alternative, that if the 2021 Guidelines Manual is used, that § 2K2.1(b)(4)(A) would apply instead. This Guidelines increases a defendant's offense level by two if the offense involved a stolen firearm. However, this alternative enhancement still does not apply in this case.

In the instant case, the government alleges that the Smith & Wesson, model 13 revolver that is part of this case was stolen. To support this claim, the government points to a police report from Cecil County, Maryland. The report references a Tommy Osbourne. Mr. Osbourne, who is 68 years old, advised a Cecil County Deputy that his neighbor, 28-year-old Jordan Errigo, was in his bedroom doing work. He claimed she had been in his bedroom between the hours of 8:00 pm on the evening of September 1, 2023, and 1:00 am in the morning of September 2, 2023. He goes on to speculate that she stole the firearm in question during that window of time. Mr. Osbourne does not say what work Ms. Errigo was doing. He also does not specify when she arrived or what time she left. He merely provides a five-hour

4

window in which he claims that she did some type of work, for some period of time. Importantly, he does not indicate when the last time he saw the firearm.

The Cecil County Deputy then spoke to Ms. Errigo. Ms. Errigo stated that she did not take Mr. Osbourne's firearm. She further stated that she could not have taken the firearm without Mr. Osbourne having known, because he was with her the entire time she was in his bedroom. The government provides no other support that the firearm was stolen.

### C. Mr. Dorsey did not Possess a Firearm in Connection with Another Felony Offense.

The imposition of the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) does not apply in the instant case. The applicable part of § 2K2.1(b)(6)(B) provides for an increase only if Mr. Dorsey used or possessed any firearm or ammunition in connection with another felony offense. It is asserted that he did. PSR at ¶ 44. That assertion is incorrect.

At a minimum the enhancement requires the possession of a firearm along with a separate felony offense. No in-depth legal analysis is required to make a determination on the applicability of § 2K2.1(b)(6)(B) in the instant case. That is because it is not necessary to deconstruct the context in which Mr. Dorsey possessed a firearm when he transacted with C.I., because he did not possess a firearm "in connection with" the transactions identified in this case. PSR at ¶¶ 23-24.

5

The governments evidence is deficient because it again relies on the same two faulty foundational supports. The September 5, 2023, recording of the transaction with the C.I. and the reliability of a claim that is attributed to the C.I.

Reviewing the recording first, the error is made plane when listening to the dialogue.

> Dorsey: "Yeah, I'm not making dollars."
> CI: "That's what I am saying. All right so."
> Dorsey: "I literally, basically, I told him, yo my folks need something."
> Dorsey: (Speaking in the voice of the person he received the firearm from) "Yeah I got my jawn but I don't want to give it away."
> CI: "Man that shit worth $1100."
> Dorsey: "I am like yo, I said you"
> CI: "What I got to give you?"
> CI: "That shit, that shit personal you not what I mean."
> Dorsey: "Naw, what I told him, I said."
> CI: "That shit ain't no joke."
> Dorsey: "I said he got 1100."
> Dorsey: "He like, (Speaking in the voice of the person he acquired the firearm from) I don't know, call me when he got the money."

D.I. 41 Exhibit I at 5:20 – 5:50.

In the series of statements Mr. Dorsey explains why the price of the firearm is $1100. The government has erroneously concluded that when Mr. Dorsey made the statement, "I got my jawn, but I don't want to give it away", he was speaking as himself. He was not. He was speaking as the third party that he obtained the firearm from. The "my jawn" statement comes in response to Mr. Dorsey telling the third

6

party, that someone he knew was looking to buy a firearm. ("I literally, basically, I told him, yo my folks need something".) By placing the statement in context it is seen as what it was, the response of the third party *to* Mr. Dorsey and not a declaration by Mr. Dorsey. While the C.I. does say to Mr. Dorsey, "[y]ou should have gave me yours (unintelligible)", he does not make that statement until over two minutes later. D.I. 41 Exhibit I at 7:40 – 7:45. The C.I.'s statement is not made in direct response to Mr. Dorsey, but rather it is interjected into a conversation that had shifted to a discussion of when the two would meet next. In addition, despite the fact that the C.I. repeats the statement, it cannot be completely understood.

The C.I. unquestionably does not say, "you should have gave me *that* one", or "I want *that* one" or even "let me see *that* one". The C.I. does not use any language that provides support for the idea that there was an additional firearm present that was possessed by Mr. Dorsey. At most, all that can inferred is that the C.I. alluded to the fact that he would have rather purchased a particular firearm that he believed was *owned* by Mr. Dorsey rather than the one he did actually buy. However, the C.I. does not indicate that a firearm was possessed by Mr. Dorsey during their meeting at the hotel.

Despite the government's assertions to the contrary, nothing on the recording provides reasonable ground to believe that Mr. Dorsey was armed during the encounter with the C.I.

The government also relies on a claim attributed to the C.I. that Mr. Dorsey had a firearm in a bag in the trunk of his vehicle when he met the C.I. later the same day. PSR at ¶ 24. However, there is no verification of the CI's claim. There is no video and no investigator saw the firearm that Mr. Dorsey is supposed to have possessed. The government's belief in the existence of this firearm is based on nothing more than the unverifiable claim of a C.I.

First even if the C.I. had seen a firearm in the trunk of Mr. Dorsey's vehicle after he reportedly purchased a controlled substance from Mr. Dorsey, this would not be sufficient evidence to demonstrate the applicability of § 2K2.1(b)(6)(B). This is because the facts would indicate that two of the four factors identified by the Third Circuit to determine whether a defendant qualifies for the § 2K2.1(b)(6)(B) enhancement would not have been met and a third would be questionable. *See United States v. Perez*, 5 F.4th 390, 401 (3d Cir. 2021). In the instant case, the firearm was

8

not accessible, not loaded and not near the drugs.[2] Accordingly Mr. Dorsey would not qualify for this enhancement.

However, the Court need not go through analysis of the four factors as it relates to the firearm. That is because there was no firearm in Mr. Dorsey's trunk. As previously stated, only the C.I. is alleged to have seen the firearm, no one from law enforcement and no independent witness makes that claim. There is also no video of the firearm.

The government would have the Court rely solely on a hearsay claim from a C.I. whose credibility is certainly in question. The C.I. worked at the behest of law enforcement. It was necessary for law enforcement to be pleased with him to derive and benefit from his cooperation with them. In cannot be reasonably questioned that law enforcement would be more likely to look favorably on the C.I. if there was a successful outcome to the case. Thus, there was an incentive to lie.

It is well established that informants who can be held accountable for providing false information are considered more reliable. See *Fla. v. J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 1378, 146 L. Ed. 2d 254 (2000). It is the "accountability" they have for the information they provide that largely distinguishes known informants from

---

[2] The government offers no evidence that the alleged firearm was loaded, as a result the Court cannot presume that it was.

9

the much less reliable anonymous informant. *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002).

In the instant case, the C.I. made a claim that investigators could not verify at the time. The C.I. met with Mr. Dorsey alone and no member of law enforcement would see the inside of Mr. Dorsey's vehicle that day without him being arrested. Importantly, the C.I. understood that investigators would never be able to challenge his claim. Assuming that the C.I. did make the claim of a firearm in the trunk of Mr. Dorsey's vehicle as stated in the PSR, he did so without risk of ever be called out on his allegation.[3] The impunity with which the C.I. operated makes his report no more reliable than that of an anonymous tipster. The Court should give no weight to a claim attributed to an essentially anonymous tipster who had an incentive to lie, and no fear that lying would result in a negative consequence.

### D. Mr. Dorsey Did Not Traffick Firearms.

The PSR provides a two-level increase, pursuant to U.S.S.G. § 2K2.1(b)(5)(B)(i)(II), if the defendant transported, transferred, sold, or otherwise disposed of, or purchased or received with intent to transport, transfer, sell, or otherwise dispose of, a firearm or any ammunition knowing or having reason to

---

[3] It is entirely possible that the claim attributed to the C.I. in the PSR at ¶ 24 has been distorted as it passed through parties. The actual statement by the C.I. may have been more equivocal.

believe that such conduct would result in the receipt of the firearm or ammunition by an individual who intended to use or dispose of the firearm or ammunition unlawfully. PSR at ¶ 43. Probation suggests that this adjustment to the offense level calculation applies because of an audio recording that the government alleges captures Mr. Dorsey stating, "I don't like giving out bullets, cause then I feel like I did it to the person." The government claims the statement is made before Mr. Dorsey sells a firearm to the C.I. PSR Objections at 36-38. *Id.* Despite the fact that there is no recoding of the conversation, it is also alleged that Mr. Dorsey was told by the C.I. that he intended to use the firearm against someone.

Probation's application of the two-level increase is incorrect for several reasons. First, Probation utilized the 2024 manual in reaching its conclusion. As explained above the appropriate manual for use in determining Mr. Dorsey's sentencing range is the 2021 manual. The § 2K2.1(b)(4)(B)(ii) Guidelines is not contained within the 2021 manual.

The government is correct that the 2021 version of the manual does also include an enhancement for trafficking firearms. PSR Objections at 37. The language of the 2021 version differs significantly from that of the 2024 version. *See* 2021

11

manual, U.S.S.G § 2K2.1(b)(5).[4] However, a comparison of both versions of the Guidelines reveals that the relevant portion is the same. Both versions call for the application of the enhancement if a defendant knew or had reason to believe that their actions would result in the transfer of a firearm to an individual who intended to use the firearm unlawfully. *See* November 1, 2024 Guidelines Manual, § 2K2.1(b)(5)(B)(i)(II) and November 1, 2021 Guidelines Manual, § 2K2.1 n.13(A)(ii)(II)."

For the enhancement to apply, the evidence must show by a preponderance that Mr. Dorsey's conduct falls under the "narrow criteria of U.S.S.G. § 2K2.1 n.13(A)." *United States v. Moody*, 915 F.3d 425, 430 (7th Cir. 2019). It is not enough that there is a chance of unlawful use, the government must demonstrate that he knew or had reason to believe the C.I. would use the firearm unlawfully. *United States v. Francis*, 891 F.3d 888, 897 (10th Cir. 2018).

It is axiomatic that the credibility concerns expressed above apply here as well. As explained previously, it is alleged, without support that the C.I. told Mr.

---

[4] To understand the scope and applicability of 2K2.1(b)(5), it is necessary to refer to the commentary. The United States Third Circuit Court of Appeals has determined that § 2k2.1(b)(5) is genuinely ambiguous and that consulting the commentary is appropriate. *United States v. Freeman*, No. 23-2869, 2024 WL 4442038, **3-5 (3d Cir. Oct. 8, 2024). The government agrees with this position. PSR Objections at 37-38.

Dorsey that he intended to use the firearm to kill a drug dealer. PSR at ¶ 43. The government provided numerous audio and video recordings. Despite this plethora of media, the government failed to capture this pivotal fact in any recording. The deficiency of support for such a vital fact becomes glaring upon closer examination. There is no logical reason that the C.I., who so aptly recorded his encounters with Mr. Dorsey, would not have recorded his conversation with Mr. Dorsey where he stated his purpose for obtaining a firearm. The C.I.'s encounters with Mr. Dorsey were not random or accidental. They were carefully choreographed and scripted. They were goal oriented to bring about a specific outcome each time. The C.I. would have known what investigators wanted to have happen, and there would have been a plan to bring that about. It is unimaginable that investigators would have failed to record the C.I.'s meetings with Mr. Dorsey. The whole purpose of getting the two together was so that investigators could get recorded evidence to use against Mr. Dorsey in a prosecution. Indeed, that is exactly what investigators did. If there had ever been a conversation between Mr. Dorsey and the C.I. where the C.I. disclosed to Mr. Dorsey that he intended to use the firearm to harm someone, it would have been recorded.

However, even if there had been a previous conversation where the C.I. disclosed that he intended to use the firearm unlawfully that did not get recorded,

13

investigators could have merely had him repeat his intention during a subsequent recording. Unquestioningly, if investigators had wanted, they could have had the C.I. repeat his intended purpose on any of the many recordings that were made. There is no logical reason that investigators did not have the C.I. establish the fact that Mr. Dorsey knew of his alleged intent by having him repeat his plan to Mr. Dorsey during a recording. In fact, it is a glaring omission that at the time the firearm is purchased by the C.I. there is no discussion of its purpose. This is true, even though there is a back and forth about bullets. Instead of stating what he intends to do, the C.I. merely makes clear, that if something happens with the firearm, Mr. Dorsey is not responsible. The C.I. could have referenced a person to be targeted with the firearm by name or by pronoun. However, the C.I. does not do this, despite the fact that there was a recording device that could have captured and preserved any potential incriminating conversation.

More significant than the fact that the C.I. does not name or even reference a person as a target, nor mention any future unlawful use of the firearm, is the fact that the C.I. does not reference back to a prior conversation about the purpose for wanting a firearm.

In the absence of any substantial evidence that Mr. Dorsey knew the C.I. intended to acquire the firearm for an unlawful purpose, the government resorts to

14

the quick exchange, heard on the recording, between the two as proof that Mr. Dorsey has knowledge of the C.I.'s unlawful intended purpose for the firearm. Rather than show Mr. Dorsey's *knowledge* with respect to the C.I.'s future intent, these comments reflect a generalized concern that the C.I. may do something wrong.

Mr. Dorsey's apprehension that the C.I. might misuse the firearm does not expand to encompass an example of the knowledge or a reasonable belief of intended misuse that the particular guideline requires. The dialogue reflects an attempt by Mr. Dorsey to disassociate himself from anything that *could* happen with respect to the firearm and not an acknowledgement that something *will* happen. The distinction is subtle but significant. Because, as previously noted, the *Francis* case demonstrates the law distinguishes between being aware of a chance of something and a reasonable belief of something, this enhancement is inapplicable to Mr. Dorsey.

### E. <u>An Upward Departure is not Warranted.</u>

The government argues that Mr. Dorsey's criminal history is understated and warrants a departure. D.I. 41 at 18. The government asserts that his prior convictions call for a sentence greater than even the incorrect calculation contained within the PSR. The government calls for an upward departure to a criminal history category of IV an offense level of 25 and a sentence of 90 months. *Id.*

While the government references Mr. Dorsey's entire record, there is a focus on Mr. Dorsey's alleged dangerous. However, while Mr. Dorsey has only two convictions which qualify as crimes of violence, they occurred 25 years ago. The incidents that gave rise to the convictions occurred involving mostly the same parties in both incidents. The individuals knew each other, and they both took place within a small window of time. Furthermore, no weapons were involved. Mr. Dorsey was 23 years old at the time.

The argument that these two incidents a quarter century ago demonstrate that Mr. Dorsey is violent is without substance. There is nothing that has taken place in the intervening years which would lead to the belief the Mr. Dorsey is violent, including his conduct in the instant case.

In addition, the United States Sentencing Commission has advocated a position completely contrary to the governments position. The U.S.S.C. has encouraged Courts to take a cautious approach to sentencing defendants based on conduct that occurred prior to age 25. *See* U.S.S.G § 5H1.1. In contrast to the governments assertion that an upward departure is warranted, the Commission counsels, that in some incidents, a downward departure may be justified. The Commission notes the impulsive, risk-seeking, behavior of young persons and the fact that that can change

16

over time. With respect to Mr. Dorsey, it did, as he never returned to the violence seen in those two cases.

The government overlooks the fact that Mr. Dorsey went more than a decade without a criminal conviction. In fact, during that time the only negative contact Mr. Dorsey had with the justice system was traffic related.

Mr. Dorsey's fall back into narcotics nearly 20 years after his last drug offense does not warrant the departure the government seeks. Mr. Dorsey's record does not reflect the kind of person the Armed Career Criminal act was designed for. Beyond Mr. Dorsey's "violent" convictions being 25 years old and not involving weapons. Mr. Dorsey's drug related offenses were of a smaller nature. Noting in his record demonstrates anything but low-level drug dealing. This is the kind of conduct that reflects subsistence activity and not anything of a measurable scale. Mr. Dorsey was able to move away from this behavior for nearly two decades before regressing.

It is true that Mr. Dorsey has a troubled past, it is also true that for more than 25 years violence has no longer part of his life. It is just as true that for nearly 20 years drug sales were not part of his life. It is also true that Mr. Dorsey had lived lawfully for more than a decade until the instant case.

## III.   CONCLUSION

For the foregoing reasons, and any others that should occur to the Court, Mr. Dorsey respectfully requests the Court sustain his objections to the PSR Guidelines calculation. Mr. Dorsey respectfully requests a sentence within the resulting Guidelines range.

Respectfully submitted,

ELENI KOUSOULIS
Federal Public Defender

Dated: January 23, 2025          By:   /s/ *David L. Pugh*
DAVID L. PUGH, ESQUIRE
Office of the Federal Public Defender
District of Delaware
800 King Street, Suite 200
Wilmington, DE  19801
(302) 573-6010

Attorneys for Robert Dorsey

18